```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,        )
                          Plaintiff,   )
 4                                     )
      vs.                              )  No. 20-CR-10023-GAO-1
 5                                     )
      BERNARDITO CARVAJAL,             )
 6                          Defendant. )

 7

 8

 9

10
               BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
11                  UNITED STATES DISTRICT COURT JUDGE
                               SENTENCING
12

13

14            John Joseph Moakley United States Courthouse
                           Courtroom No. 22
15                         One Courthouse Way
                        Boston, Massachusetts 02210
16

17                          March 16, 2022
                              3:11 p.m.
18

19

20

21               Kathleen Mullen Silva, RPR, CRR
                       Official Court Reporter
22         John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 7209
23                  Boston, Massachusetts 02210
                    E-mail: kathysilva@verizon.net
24
              Mechanical Steno - Computer-Aided Transcript
25
```

```
 1   APPEARANCES:

 2

 3           United States Attorney's Office

 4           AUSA Elysa Q. Wan

 5           AUSA Stephen W. Hassink

 6           John Joseph Moakley U.S. Courthouse

 7           Boston, Massachusetts 02210

 8           617.748.3520

 9           for the Government

10

11           Masferrer & Associates, P.C.

12           Eduardo A. Masferrer, Esq.

13           45 Bromfield Street

14           Boston, Massachusetts 02108

15           617.531.0136

16           and

17           Law Office of Lenore Glaser

18           Lenore Glaser, Esq.

19           45 Bromfield Street, Suite 500

20           Boston, Massachusetts 02108

21           617.753.9988

22           for Defendant

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.  United States District Court
 3     for the District of Massachusetts.  Court is in session.
 4            Be seated for a sentencing in the case of United
 5     States v. Bernardito Carvajal, 20-10023.
 6            Would counsel identify yourselves for the record.
 7            MS. WAN:  Good afternoon, Your Honor.  Elysa Wan for
 8     the United States.
 9            MR. HASSINK:  Good afternoon, Your Honor.  Steve
10     Hassink for the United States.
11            THE COURT:  Good afternoon.
12            MS. GLASER:  Good afternoon, Your Honor.  Lenore
13     Glaser for Bernardito Carvajal.
14            MR. MASFERRER:  Good afternoon, Your Honor.  Eduardo
15     Masferrer for Mr. Carvajal.
16            THE CLERK:  And from probation.
17            PROBATION:  Good afternoon, Your Honor.  Iris Golus
18     from probation.
19            THE CLERK:  Mr. Interpreter, could you please raise
20     your hand.
21            **LUIS A. PEREZ-NEGRON, Interpreter, sworn**
22            THE INTERPRETER:  Luis Perez, Spanish interpreter.
23            THE COURT:  Mr. Carvajal appears today for sentencing
24     on his conviction of two counts of distribution of fentanyl,
25     those convictions coming upon a jury verdict after a trial.
```

1           I have sentencing memoranda from both the government

2    and the defense, and I have, of course, other materials.  I

3    have received a letter from Richard Tonks's mother, which will

4    be in the record.

5           There is also some briefing on a separate issue from

6    the main substantive issues, and that is whether family members

7    should be allowed to make statements.  Is there a controversy

8    about that that continues?

9           MR. HASSINK:  Your Honor, we filed the motion and you

10   ruled that they would be allowed to speak.  After that ruling

11   defense filed an opposition.

12          Our position is you ruled on the motion they be

13   allowed to speak.  They are here today and ready to speak in

14   reliance upon the Court's ruling.  If the court would want to

15   hear additional argument, we're happy to respond.

16          THE COURT:  I guess I was more asking for the

17   defense's view on that.

18          MS. GLASER:  Your Honor, thank you.  We felt, and

19   apologize whether this was our mistake, that it made no sense

20   to respond to their motion until the presentence report was

21   filed, which we did.  The presentence report actually did not

22   identify a victim in this case, and then we filed our

23   opposition.

24          One of the things you should note is that in your

25   decision you asked the government to inform -- to provide

1    notice to the defendant of the content or proposed content of

2    the family.  We have not received anything on that matter.

3         This is obviously an issue that you are going to take

4    up in some depth for the actual sentencing.  It's a critical

5    issue as to whether or not there is any cause to be put on

6    Mr. Carvajal despite the fact that we have a jury -- a very

7    specific jury verdict to the contrary.  And for those reasons

8    it would be completely inappropriate to have the family speak,

9    and especially, as I said, when the government hasn't complied

10   with your order or given us notice of what the family would

11   intend to say.

12        MR. HASSINK:  Your Honor, if I could respond.  The

13   Court's order said the family is allowed to speak and the

14   government must instruct the family that statements are to be

15   directed to the court and not the defendant.  We have complied.

16   We have met with the family and complied with that order.

17   There's nothing in that order that we're aware of that required

18   us to disclose the contents of the family's -- what they plan

19   to say.  It was a simple docket entry and we complied with that

20   portion of the order.

21        THE COURT:  Well, there's three?

22        MS. WAN:  There are four here today, Your Honor.

23        THE COURT:  Who's the fourth?

24        MS. WAN:  So it's the grandfather, the stepmother, the

25   sister and the father.

1          THE COURT:  It sounds like -- I don't think I'll

2    include the stepmother.  I'll include the grandfather, the

3    father and the fiancé.

4          MS. WAN:  Your Honor, it's the sister.  Your Honor, at

5    the time we filed the motion we didn't know who would want to

6    speak.  So we talked about the father, the grandfather and the

7    girlfriend, who were the witnesses at trial.

8          THE COURT:  Right.

9          MS. WAN:  The stepmother would like to speak.  She's

10   been -- she was in Richard Tonks's life from a very early age

11   through the time of his death and she's here and would like to

12   address the court.

13         MS. GLASER:  Your Honor, we would just point out we

14   would maintain our objection and point out that according to

15   *United States v. Berzon*, which we cite in our opposition, there

16   is an obligation of the government to provide notice, which, as

17   we've said and which the government agrees with, that we have

18   received no notice, not of who intended to speak nor the

19   content.  So we renew our objection to any and all family

20   members speaking.

21         THE COURT:  Okay.  I think I'll enforce the limit that

22   I described.

23         MR. HASSINK:  You said the "fiancé."

24         THE COURT:  Fiancé.

25         MR. HASSINK:  The sister is here.

1          THE COURT:  I'm sorry?

2          MR. HASSINK:  So here today are the grandfather,

3    father and the sister.  The fiancé is not here.

4          THE COURT:  Okay.  Then it would be just the father

5    and grandfather.  Well, no.

6          MR. HASSINK:  She's the victim's sister.

7          THE COURT:  She can be included, yes.  She's a family

8    member.

9          But I will say, at least with respect to the father

10   and grandfather, I appreciate the opportunity to do it, but

11   they did testify at length at the trial and so I hope it's not

12   unduly repetitive.

13         MR. HASSINK:  Your Honor, it's more about the impact

14   of the loss than the facts of the case.

15         THE COURT:  Right.  I understand.

16         All right.  We have a presentence report that's

17   completed and submitted by the Probation Office and sentencing

18   memoranda obviously from both the government and the defense

19   and a response from the government.

20         So a customary place of beginning the hearing is to

21   determine the offense level and criminal history category and

22   therefore what sentencing range is recommended by the United

23   States Sentencing Guidelines.  The presentence report as

24   prepared by probation suggests an adjusted offense level of 24.

25   There's a criminal history category of zero -- I.  Zero points,

1    Category I.

2         There were some objections by both sides submitted to

3    the Probation Office that have been included with the report.

4         Are there some that need to be addressed?  First from

5    the government?

6         MR. HASSINK:  Yes, Your Honor.  We objected to two

7    things.  The first was that there was no identifiable victim in

8    this case.  We asked the court in our filings to find that

9    Richard Tonks is the victim and that because the drugs dealt by

10   the defendant caused his death that this court upwardly depart

11   under Section 5K2.1 of the Sentencing Guidelines.  And I'm

12   happy to provide argument at this time on that, Your Honor.

13        THE COURT:  Yeah, go ahead.

14        MR. HASSINK:  Yes, Your Honor.  So we believe an

15   upward departure under the guidelines is appropriate here,

16   starting with the language of the statement itself.  "If death

17   resulted, the court may increase the sentence above the

18   authorized guideline range."  At trial the defendant was found

19   guilty of distribution of fentanyl on June 12 to Mr. Tonks the

20   night before he died.  However, because it's sentencing and we

21   are under a different standard of proof, we think the court can

22   and should make the additional finding that the defendant also

23   dealt cocaine to Mr. Tonks, and that the fentanyl and cocaine

24   caused Mr. Tonks's death.

25        In the alternative, if the court doesn't believe that

1    such a finding is supported by a preponderance of the evidence,

2    this court can and should find that the fentanyl alone caused

3    the victim's death.  The court heard evidence from the medical

4    examiner, Dr. Capo-Martinez, who said that she could not

5    untangle those two, and either one of them could have caused

6    his death; and heard testimony from Dr. Bird, who testified

7    that the fentanyl itself was the cause of his death.  That in

8    addition to all the other evidence the court heard at trial and

9    respecting the jury's verdict that they found -- that they

10   acquitted him under the beyond a reasonable doubt standard,

11   we're asking this court to find at sentencing under the

12   preponderance of the evidence standard that those drugs in fact

13   caused Richard Tonks's death.  And because of that, we ask for

14   an upward departure under 5K2.1.

15          Now, we believe that this upward departure is

16   appropriate.  First off, the guidelines do not, in fact, bake a

17   death directly linked to the drugs dealt by the defendant to

18   the base offense level.  The guideline range certainly takes

19   into account the different dangerousness of different drugs.

20   Fentanyl is rated higher, for example, than cocaine.  However,

21   the death directly caused by the drugs is not baked into the

22   guideline range itself.  So under 2K2.0 it is appropriate to

23   upwardly depart because a death resulted.

24          The use of acquitted conduct, which has been the

25   subject of much briefing, is allowed at sentencing in

considering either a departure or a variance.  But in this
case, we believe that the basis for that is quite logical.  The
jury is operating under a different standard than the court at
sentencing.

And so the jury's finding that the drugs did not cause
the death under that higher standard does not affect this
court's consideration under the lower standard.

Although the defendant has cited concurrences and
dissents about what certain judges think the law should be, the
state of the law we believe is clear, that acquitted conduct is
appropriate to be considered at sentencing.  It does not
violate the Constitution or the defendant's due process rights
to do so so long as the conduct is proven by a preponderance of
the evidence, which we believe it is here.

Finally, with respect to the upward departure, we
believe an 8-level upward departure, which is effectively what
we are asking for, is warranted.  In our briefing we provided
the court with multiple cases in which a court found at
sentencing that an upward departure was appropriate based on
the resulting death from an overdose, even though that conduct
was not charged as part of the conduct of conviction.  We're
asking for 8 levels but have cited cases where courts have
given a 15-level, a 14-level, 8-level, a 12-level and a
22-level upward departure.  So we believe, given the facts and
circumstances of this case, that an 8-level upward departure is

1    warranted, it's appropriate, it's well within the quantity of

2    upward departure that other courts have considered appropriate

3    in these cases.

4            For all those reasons, Your Honor, we believe that

5    this court should make the finding by a preponderance of the

6    evidence that the drugs this defendant dealt caused Richard

7    Tonks's death and upwardly depart because of that.

8            THE COURT:  Okay.  I think you're getting a little

9    ahead of yourself.  What I'm trying to address is whether the

10   guidelines are coherent in their recommendation, not whether

11   you agree with it.

12           MR. HASSINK:  I'm sorry, Your Honor.  We agree that as

13   the drug weight is calculated, that base offense level 24 is

14   the appropriate number in this case, but I just wanted to make

15   sure we addressed the fact that since 5K2.1 is a guidelines

16   provision that we addressed it in the portion of the guidelines

17   argument.

18           THE COURT:  Right.  But ordinarily, at least in my

19   practice, we settle the guidelines recommendation and if there

20   are reasons to depart from that, which we often hear these

21   days, that is on the basis of what has been established as the

22   guideline range and extensions to it, additions or subtractions

23   as part of the general sentencing recommendation.

24           MR. HASSINK:  Understood, Your Honor.  Sorry I jumped

25   the gun.

1          THE COURT:  So let me ask more pointedly, do you

2    object to the assignment of an adjusted offense level of 24

3    under the orthodox application of the guideline provisions?

4          MR. HASSINK:  No, Your Honor.

5          THE COURT:  Okay.  Is that it from the government on

6    the calculation proposed in the PSR by probation of the

7    guidelines?

8          MR. HASSINK:  Yes, Your Honor, it is.

9          THE COURT:  Okay.

10         MR. MASFERRER:  Thank you, Judge.  And I'll limit it

11   to just that issue.

12         Your Honor, we have basically two objections.  We

13   objected to some of the drug weight as calculated by probation.

14   However, it results in the same --

15         THE COURT:  It doesn't matter.

16         MR. MASFERRER:  It doesn't matter.

17         THE COURT:  Right.

18         MR. MASFERRER:  We agree with the end result number.

19         We do submit to the court and we did submit to

20   probation that the defendant is entitled to a two-level

21   reduction for acceptance.  The reason for that is the fact the

22   defendant went to trial alone is not a reason to not grant the

23   two-level reduction for acceptance.

24         From our opening statements, we conceded the two

25   charges that the defendant was, in fact, convicted of.  We

1    indicated at opening that the defendant had sold drugs to

2    Mr. Tonks as charged in Count One.  We conceded at opening the

3    defendant had sold drugs to the agent as conceded in Count Two.

4         The specific drugs that the defendant conceded selling

5    are the specific drugs that the jury found him guilty of.  So

6    it would appear that, while we appreciate we may not get a

7    third point because of the issue of a trial, we do think the

8    guidelines should calculate the two-level reduction.

9         I'll point out to the court that Count One of course

10   contained the allegation of death resulting.  So the defendant

11   was in no position to plead prior to trial as he couldn't plead

12   to the indictment as charged.  He had to go to trial to concede

13   the portions that he was guilty of and contest the issues that

14   he is not guilty of.  And that is what our memo suggests to the

15   court and why we're asking the court to find that two-level

16   reduction.

17        So we think that the proper calculated offense level

18   is a 22.  Thank you.

19        MR. HASSINK:  Your Honor, we disagree.  We believe 24

20   is the appropriate calculation.  So it's called acceptance of

21   responsibility.  And I'm just reading from the application note

22   to Section 3E1.1.  Although going to trial is not a complete

23   basis for denying the two points, they should only be given

24   when the defendant admits guilt and expresses remorse and that

25   should only be in, quote, "rare situations."

1          In such a situation, and I'm in Application Note 2,
2     where a court believes it's appropriate despite the defendant
3     going to trial, "a determination that a defendant has accepted
4     responsibility will be based primarily upon pretrial statements
5     and conduct."  So a strategic decision by defense counsel in
6     the opening to concede points that were at issue at trial is
7     not the same as acceptance of responsibility.  And because that
8     only came at trial at the opening statement, it's also outside
9     of the application notes for when a two-point reduction would
10    be appropriate despite going to trial.
11          For those reasons, Your Honor, we don't believe the
12    two-level reduction is appropriate.
13          THE COURT:  I agree with the government and probation
14    as to this issue.  Just in shorthand, I rely significantly on
15    Section 3E1.1, Application Note 2.
16          Anything else from the defense?
17          MR. MASFERRER:  Judge, no, that's the only issue we
18    take with the calculation.
19          Of course, note our objection to the court's ruling.
20          THE COURT:  So I believe unadjusted the proposed
21    application -- application proposed by the PSR, and that
22    results on the terms of the PSR, it is level 24 and a Category
23    I with a suggested guideline range of 51 to 63 months.
24          So I'll hear you now as to your specific
25    recommendations.  Ms. Wan.

1           MS. WAN:  Your Honor, the government seeks a sentence

2    of 10 to 12 years of incarceration and three years of

3    supervised release.  This recommended sentence is based on an

4    upward departure under 5K2.1, which Mr. Hassink has already

5    described, and an upward variance under the 3553 factors.

6           The defendant was convicted of distributing fentanyl

7    to Ricky Tonks, a 26-year-old man, on the night before he died

8    of a drug overdose.  And the defendant also distributed to an

9    undercover agent about two months later.  The defendant

10   willingly traded deadly drugs for profit and his greed was one

11   cause of Ricky's death.

12          The defendant and Ricky started out as friends.  They

13   worked alongside each other at the Horseshoe Grill in Reading.

14   The defendant leveraged that friendship to sell drugs to Ricky

15   to make money for his own personal gain.  It was the defendant

16   who reached out to Ricky in January of 2019 and offered him a

17   sample of his product.  It was the defendant who texted Ricky

18   again in April and May, when Ricky was desperately trying to

19   stay clean.  And when Ricky relapsed and his drug habits

20   spiraled out of control in June of 2019, the defendant was

21   there to supply Ricky at all hours day and night.  He sold

22   Ricky drugs 11 times in the eight days before Ricky's death.

23          After Ricky died, what did the defendant do?  He

24   texted Ricky and when he didn't get a response, he blocked

25   Ricky and Ricky's girlfriend on his Facebook account but

1    continued to sell drugs.  He sold it to other customers in the

2    throes of addiction and he sold it to an undercover officer a

3    few months later.

4           Now, the defendant points out that these drugs were

5    processed through a multi-level drug trafficking organization

6    and the defendant was only one rung in that organization.  But

7    the fact that other people were culpable or involved does not

8    negate the responsibility of each member of that enterprise and

9    here the defendant was in a unique position.  He was the drug

10   supplier who dealt directly and intimately with the customers

11   that he sold his drugs to.  He saw firsthand the devastation,

12   the overdoses, the dangers of fentanyl, which is 50 times

13   deadlier than heroin, a hundred times more powerful than

14   morphine and now responsible for 92 percent of opioid-related

15   deaths.

16          The government's recommendation of 10 to 12 years of

17   incarceration does not aggregate the jury's verdict.  The jury

18   and the court have different roles.  The jury may find it's a

19   fact beyond a reasonable doubt and it's the Court's

20   responsibility to determine the appropriate sentence given the

21   Sentencing Guidelines, the nature and circumstances of the

22   offense, and the seriousness of the offense.

23          The government is not seeking the statutory maximum

24   here, the 20-year term that the defendant would have -- that

25   would have been mandatory if the jury had found the defendant

1    guilty of distribution resulting in death.

2          Now, the defendant also argues that he has no criminal

3    history and the sale to the undercover agent was the biggest

4    sale that he had ever made.

5          First, the defendant had only been in the United

6    States for about two years before he was arrested in this case.

7    And second, the defendant's claim that this was the biggest

8    sale he ever made is not a mitigating factor.  The callousness

9    and intrepidness he showed after Ricky's death demonstrates

10   that he would have continued to sell drugs and would have sold

11   at more -- sold larger quantities if given the opportunity.

12         Now, despite the defendant's attempts to paint this

13   case as a routine victimless buy/bust operation, that's simply

14   not true.  The human destruction caused by the drug trade

15   cannot be ignored and cannot be understated.  It's not measured

16   in statistics or grams or points under the Sentencing

17   Guidelines.  The real human toll cannot be expressed by anyone

18   more meaningfully than the victim's family.  And at this point

19   we acknowledge that the court received a letter from the

20   defendant's mother, Shelly Miller, and we'd ask the court to

21   hear statements from several of the defendant's family members

22   who are here today -- excuse me, several of the victim's family

23   members:  The victim's grandfather, Richard Tonks; the victim's

24   sister, Alexis Tonks; and the victim's father, Philip Tonks.

25         THE COURT:  All right.  If they would come to the

1    central lectern to use the microphone.  I think there's a

2    microphone there.

3              THE CLERK:  Yes, there is, Judge, behind the screen.

4              MR. RICHARD TONKS:  Your Honor, my name is Richard

5    Tonks.  I'm Richard's grandfather.  The family calls him Rick.

6              Rick had been living with me for several years, so he

7    was a very integral part of my life and now that's gone.  I

8    spent a lot of time with him and did what I could to help him

9    with his addiction.  It was a struggle for him but he was

10   finally able to get away from heroin.

11             Losing him has left a big painful hole in my heart.

12   Watching his father go through the pain of losing his son is a

13   terrible thing to see.  I know that pain because I lost a son

14   who OD'd at 22.  I feel Rick may have stayed clean if there

15   wasn't someone putting drugs in front of him like constantly

16   offering an alcoholic a drink, stating one won't hurt, but it

17   will.

18             Rick was a gentle soul.  I never knew him to hurt

19   anyone or take advantage of anyone.  When he messed up his

20   probation, on his own he turned himself in to the court,

21   telling me he wanted to put all of that behind him and move on

22   with his life.  I believe he was doing well until someone

23   dangled the carrot in front of him.

24             Losing Rick will never stop hurting for me and my

25   family.  He was also the only grandchild with the family name.

1    There's no one to carry on the name farther down.

2           Thank you, Your Honor, for listening.

3           THE COURT:  Thank you, sir.

4           MR. HASSINK:  Your Honor, if her mother may just stand

5    by her side.

6           THE COURT:  Fine.

7           MS. TONKS:  Good afternoon, Your Honor.  Before I

8    start my statement, I would just like to say that I know that

9    you don't want to consider listening to my mother but she did

10   raise Rick and not Shelly.  So that's just something I would

11   like to say before I start.

12          Like I said, my name is Alexis Tonks.  I was born in

13   October of 2003, which makes me ten years apart from my brother

14   Ricky.  This age difference did not change the strong bond that

15   my brother and I held.  I only knew life with him in it.  I

16   grew up with him and he taught me so many lessons about life.

17   But my lessons, my laughter, my joy, my smile, my life has

18   never been the same since June of 2019.

19          When I was 15 I was ending my freshman year of high

20   school, supposed to be having a fun summer into my sophomore

21   year, but since June of 2019 all I've been filled with is

22   anger, sadness and regret.  This anger took over my body.  I

23   made horrible decisions and treated people poorly and I did not

24   take care of myself and grow.  At the age of 15 I was starting

25   to actually get myself together.  I recovered from an eating

1   disorder.  I stopped self-harming and I truly found some kind

2   of peace within myself and others.

3          On that day in June of 2019 it was almost like

4   everything in my life stopped and started crumbling back to

5   where it never wants to go again.  I hated everything.  I hated

6   having fun.  I hated smiling.  I hated everything I would do or

7   want to do with my brother because I knew I would never be able

8   to do it again.  I struggled.  I hurt myself mentally and

9   physically because I was too young and did not know how to deal

10  with anything going on around me.  I would not eat.  I would

11  have these horrible panic attacks to the point where I thought

12  I was having a heart attack.  I developed depression which I

13  fight with to this day.

14         I knew I couldn't stay like this forever.  I knew I

15  couldn't be mean to my mom for my own pain when she was

16  suffering as well.  I knew I couldn't shut out my dad because

17  he reminded me too much of my brother.  I knew I couldn't put

18  myself through this pain anymore.  It took a while and I'm

19  still struggling to find peace without my brother.  I miss my

20  brother every day.  The days always seem to be so gray without

21  him.  I miss going to my dad's and seeing him and catching up.

22  I miss eating his amazing meals he would make.  I miss hugging

23  him and knowing I have this amazing big brother that will

24  protect me and have my back no matter what.

25         I make art to express how I feel about him.  I went to

1    grieving meetings telling people I don't even know about my

2    heartache.  I found a career that I am pursuing which makes me

3    feel slightly more at peace in being a police officer and

4    serving justice, but I am tired.  I'm tired of when I'm meeting

5    new people I feel like at some point I need to tell them my

6    brother passed way because I feel responsible too.  I'm tired

7    when we talk about drug-related topics in class, my teachers

8    always ask me if I want to take a walk.  I'm tired when I hang

9    out with people and when any drugs gets brought up, everyone

10   just looks at me.  I'm crushed that my brother never got to see

11   me drive my car, the car that was his, the car that I share

12   with him to this day and I cherish because it's the only thing

13   I have left of him.

14        He didn't see me win five Massachusetts records.  He

15   didn't get to be there for my father and I after we compete.

16   He won't see me graduate.  He won't be at my wedding.  And I

17   won't be able to laugh so hard anymore because of him.  And if

18   you had asked me in May of 2019 who my brother was, I would say

19   he was a fun, funny, quiet, creative, adventurous, patient,

20   optimistic and brilliant person.

21        Did you notice how I didn't say a junky, a drug

22   addict, a drug user?  Not because I was too young to get it,

23   because I did.  I wrote an entire research project on how drug

24   addiction affects families.  I knew.  But I also knew he would

25   admit himself into rehabs, get clean, attempt to better

1    himself.  He was a good person who met bad people and made bad

2    decisions but that does not take away from his life.

3         His life was valuable.  He was important to so many.

4    He lived for his family, cooking, hiking, dogs and any animal.

5    He wasn't just the junky I feel people who don't even know him

6    try to display him as.  And to the people who think they know

7    him and would solely identify him as a drug addict or so on,

8    you don't know him because that wasn't him.  He fought just

9    like I fight every day with the guilt of losing him.

10        I forgive Ricky.  I forgive myself.  But I will never

11   forgot that day in June because it took a part of me that I

12   will never get back and I miss and love him so much.

13        So now that I am 18 standing in this courtroom I

14   believe that justice should be rightfully served.  Thank you.

15        THE COURT:  Thank you.

16        MR. PHILIP TONKS:  Your Honor, my sincere gratitude

17   for giving me this opportunity.  My name is Philip Tonks.  I'm

18   Rick's dad.

19        Rick's death has torn apart my son Cole.  Cole, he

20   still wrestles with the reality, his attempts to come to terms

21   with losing his brother, his buddy.  Many years ago I too lost

22   a brother from addiction.  So I can relate to my son Cole's

23   pain.  I understand why he doesn't always want to talk about

24   his loss, anger and sadness.  Sometimes just shutting down

25   seems to be the only option.

1          Rick's death is also tormenting my daughter Alexis.

2     She has creatively built shrines in his honor through her

3     artwork, a tattoo with his name, Rick's, now her car, and the

4     list goes on and on.

5          This tells me that Alexis loves him.  She respected,

6     she adored Rick but it also tells me she grapples and stresses

7     with the thoughts she will have to spend the rest of her life

8     without Rick.  All these pieces of Rick's death, the how, why

9     and when has regrettably changed my kids, Alexis and Cole's

10    personalities, how they view the world and the people that are

11    in it.

12         Cole and Alexis -- Cole, Alexis and Rick have always

13    been the most important people for me.  They're my kids.  So

14    knowing Cole and Alexis are sad, angry, scared and disappointed

15    is my torture, my pain.  What hurts them hurts me.  I try to

16    comfort them.  I try to appear strong.  But they have to cope

17    with losing their brother Rick.  I can't fix this one.

18         A quote from Alexis's public reading during Rick's

19    funeral, she said, "Remember my brother by how close he was

20    with our dad."  I was comforted by her words.  I really needed

21    that.  Rick and I did grow close.  We both worked hard for a

22    strong adult relationship.  We definitely enjoyed our times

23    together.

24         So Rick being the oldest, this was new for me, a new

25    parental journey, and I loved it.  Rick and I figured out how

1  to make it work and it was so much more than I expected.  Rick

2  and I set the groundwork for my relationships with Cole and

3  Alexis.  So thanks, Rick.

4      I guess I didn't fully realize how much I would miss

5  that close relationship with Rick until it was taken away from

6  me.  I really miss it so much.  I treasure the times we had but

7  the sadness of never again torments me.

8      Rick struggled with addiction.  He had a disease.  I

9  feel fortunate Rick was able to talk with me about his

10 struggles.  Rick hated his addiction.  He was embarrassed,

11 ashamed and felt trapped and hopeless.  I have been enlightened

12 on what addiction is, what it does to a person.  I got it

13 firsthand from someone I love and respected as a human being.

14     Rick was respectful.  He was kind, quiet.  He was a

15 likeable, loveable person, human being.  Regardless if he was

16 in the throes of addiction or not, he wouldn't intentionally

17 hurt someone, be disrespectful or mean.  Was there a

18 difference?  Of course.  But he tried to hide it, fight it.  He

19 didn't like who he was when he just couldn't fight those

20 demons.

21     Over the years so many of us have dealt with the

22 horrifying knowledge that Rick was hurting, struggling with

23 such a misunderstood weight on his back, his soul.  We were

24 stressed.  We were scared, confused, angry and disappointed.

25 Everyone tried because we love Rick.  He was worth it.  He was

worth all those awful, hopeless, powerless feelings that we
have endured.  We tried constant monitoring, drug testing,
professional help, anger, scaring, threats, love and
acceptance.  I learned some valuable lessons about the people
who care and love Rick and the impact of what they dealt with
over those years we had Rick.  I think I've learned that it's
been fear, reality, unconditional love and just living with a
loved one's addiction.

          The day we lost Rick I came home and things didn't
seem, not normal.  As I was walking into the house I remember
thinking, please don't let this be the day.  A few hours later
Rick's grandfather calls me, why are there ambulances at the
house?  Where is Rick, he asked.  Morgan was out of the
country.  I had to call her and I did not want to make that
call.  Morgan is a sweet girl, not an angry person, certainly
never towards me.  She said, Why are you calling me?  It's
about Rick, isn't it?  You're lying.  All I said was, Hi,
Morgan.  She knew why I was calling.

          Rick's stepmother Stacey and I live in separate towns.
So the next morning I texted Stacey.  "I need to come by" is
all I can say.  Before I can even -- before I can even open the
door, Stacey's garage door flies open.  She's running up
screaming, No, no, no, and falls to the ground crying.  I
hadn't uttered a word.  She knew why I was there.  That moment
and others will haunt me forever, these snapshots of the

1    horrible realities, the living nightmares of loving and living

2    with someone's addiction.

3            Rick was doing great for what seemed a long time.  He

4    was making a positive productive life for himself.  He was drug

5    free.  It was so refreshing and inspiring to see the changes he

6    was making.  Rick was enjoying his life.  We were enjoying

7    Rick.  I started feeling hopeful, less stressed.  I let my

8    guard down.  I gave him space.  I stopped drug testing,

9    annoying and questioning him so much.  I will have to carry the

10   responsibility of not being constantly vigilant.  You can't

11   ever let your guard down, get comfortable, be hopeful when a

12   loved one has the disease of addiction.

13           This addiction that is a plague killing people of all

14   ages and crushing the spirits of families and loved ones is a

15   never-ending roller coaster of hell.  It leaves a wake of

16   destruction behind it, broken souls and victims.  Us, the loved

17   ones still alive coping with our losses, the young adults

18   fighting a seemingly losing battle are the victims.

19           It saddens me to witness how addiction is negatively

20   affecting our society.  We all see it.  Too many of us have

21   become victims in some form.  It's disappointing to know some

22   benefit from the struggles of addiction.  They exploit it with

23   predatory behaviors to gain money from others suffering with

24   what seems to be no care or thought how it affects and hurts

25   people.

1          I don't know how to fight this enormous problem, this

2    battle, but I am hopeful through this tough journey I have met

3    some people that do care and will fight for those victims and

4    the unfortunate addicts.  Victim specialist Jessica, Agent

5    Gina, Attorney Steve and Elysa, they care, they'll fight.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Ms. Wan.

9          MS. WAN:  Nothing further from the government.

10         THE COURT:  Mr. Masferrer.

11         MR. MASFERRER:  Yes, Your Honor.  Thank you.  So, Your

12   Honor --

13         THE COURT:  Actually, may I just -- just to tie off a

14   couple things before you begin your final remarks.  They're

15   your points.  There were four objections to the PSR.  You

16   articulated one here and I just want to address the other three

17   to be clear that you're not pressing those at this point.

18         You made an argument under the *Blakely* case about an

19   upward limit.

20         MR. MASFERRER:  Yes, Your Honor, I didn't perceive

21   that that was an objection to the guidelines.  I thought that's

22   what you wanted me to talk about now.

23         THE COURT:  Okay.  You want to address those matters

24   in this.  Okay, fine.  I just didn't want to leave them

25   unaddressed.

1          MR. MASFERRER:  Of course not, Your Honor.  Thank you

2     so much.  I'll try to organize the different issues that I see

3     here before the court.

4          The court has calculated the guideline range at a

5     level 24 with a criminal history level of I.  Our position is

6     that guideline range as calculated by the court properly, over

7     my objection, is the reasonable limit that we are talking about

8     for *Alleyne Apprendi* purposes.  To leave that guideline range

9     requires either a departure or a variance in the general scheme

10    of things.

11         The government has raised a departure argument for

12    starters.  I would submit to the court that the departure is

13    not appropriate in this case.  I won't belabor the point too

14    long because most courts in most decisions, as I'm sure the

15    court saw, lets the court -- even if it's not permitted as a

16    departure, it's permitted as a variance.  So I think that's

17    sort of distinguished there.  But insofar as we're going

18    through that, the departure has to be authorized under 5K2.0.

19    It is not here because of the rules of the departure.  For

20    starters, it requires that this be conduct that is not taken

21    into account by the Sentencing Guidelines.  This is taken into

22    account by Sentencing Guidelines.  It says specifically in

23    5K2.0 that it should only be taken if it is of a kind or to a

24    degree not adequately taken into consideration by the

25    Sentencing Commission in formulating the guidelines.

1          A drug offense that results in death is specifically

2    taken into account by the guidelines.  It is 2D1.1A.  It lists

3    out all of the offenses, and I've listed them in my memo, that

4    qualify, all drug offenses that link back.  It sets guideline

5    ranges that are increased penalties that are not the mandatory

6    20-year minimum.  So really the guidelines do take this conduct

7    into account.  They simply state it has to be for a specific

8    offense of conviction.  So the guidelines specifically left out

9    this offense as an offense of conviction that warrant an

10   increase if it's eventually demonstrated that death resulted

11   from by a preponderance of the evidence.  So I don't think a

12   departure is warranted.  The Probation Department properly

13   calculated it without bringing that in because it is not part

14   of the Sentencing Guidelines even though it's considered by the

15   Sentencing Guidelines.

16          In terms of the type of drug that we're talking about,

17   fentanyl, the Sentencing Guidelines already established

18   increased penalties because of fentanyl's dangerousness.  So

19   those two reasons for departing, because it's fentanyl that has

20   an increased cause of death, or because a death might be

21   associated, both are taken into account by the Sentencing

22   Guidelines when appropriate convictions occurred, even

23   notwithstanding the acquitted conviction here.

24          The next point would be for the court to simply impose

25   a variance.  The court has a lot of discretion in variance.

1    The case law on that is broad.  The Sentencing Guideline

2    Commission wants the court to hear every possible fact, make

3    all determinations under a preponderance of the evidence

4    standard.  Before I reach whether or not this is even reaching

5    the preponderance of the evidence standard, the concern that I

6    have here is not a concern that's echoed in minority opinions

7    or it's not a concern that's mentioned only in dissents.  It is

8    a majority opinion and concern mentioned by the Supreme Court

9    multiple times.

10          The government often likes to cite *McMillian* for that

11   proposition.  *McMillian* specifically stated it was raising the

12   concern that you could reach a variance for a single fact that

13   was not proven beyond a reasonable doubt drives the sentence

14   where you have a situation where the tail wags the dog.  That

15   is this case here.  The First Circuit has specifically worried

16   about this exact issue.  In the *United States v. Lombard* case,

17   which was decided in 1995, the court had concerns.  It was

18   concerned about a structure such as this one where the offense

19   of conviction -- I'm sorry -- this is a firearm case -- let me

20   back up.  I apologize.

21          In *Lombard*, the defendant was acquitted at a state

22   court trial of murder.  Upon his acquittal, the federal

23   government charged him with a firearm offense, prosecuted him

24   for the firearm offense, was convicted of a firearm offense,

25   and then asked the court to impose a life sentence, saying that

1    the murder, since that firearm was used in the murder, should

2    be a variance or a sentencing factor to take into account.

3        So there the court had all sorts of concerns.  Thus, a

4    rule structure that bars conviction of a firearms charge except

5    on proof beyond a reasonable doubt, but then permits imposition

6    of a life sentence upon proof of a murder by a preponderance of

7    the evidence, in effect, creates a situation with the lesser

8    procedural protections to the issue that is lesser than the

9    greater one.

10       We have the same thing here.  This is not a situation

11   where the government is merely ratcheting up the guidelines or

12   seeking a minimal increase.  They are seeking to double, if not

13   triple, the defendant's recommended sentence on a fact that has

14   not been proven, we would submit, not even by a preponderance

15   of the evidence but was specifically rejected by the jury.

16       *Lombardo* talks about these concerns.  Sentences such

17   as these ones which result from the convergence of several

18   doctrines and sentencing law each individually well accepted,

19   and none of which is individually questionable, can still

20   create a problem.  Just as folk wisdom recognizes that the

21   whole is often greater and different than simply the truth of

22   its parts, these individual doctrines, each reflecting

23   compromises in our criminal jurisprudence, in this extreme case

24   threatens in its combination to erode rights that the

25   Constitution does not permit to be compromised.

1          The government has asked the court to find the

2     defendant responsible for Mr. Tonks's death.  We would submit

3     to the court that that would be -- that would do violence to

4     the jury's verdict in this particular case.  The government

5     cannot point the court to a case where after a jury trial, with

6     a specific verdict of its own creation, that the arguments made

7     by the government were rejected, that the court then punished

8     the defendant for those things.

9          In *United States v. Watts*, the Supreme Judicial Court

10    raised the issue of using acquitted conduct and in it noted

11    that part of the reason that we permit that is because general

12    jury verdicts have no specific findings and, therefore, it is

13    difficult to ascertain without a specific jury finding what

14    were the actual inferences the jury was drawing when it

15    acquitted a person of that conduct.  We don't have that here.

16    We have specific jury verdicts.  The court may recall that the

17    government asked Your Honor, and Your Honor agreed and we

18    didn't object, to a jury verdict form where it wasn't asked

19    simply did he sell, did the defendant sell drugs to Mr. Tonks

20    but which specific ones.  Was it fentanyl and was it cocaine?

21    And the jury acquitted him of cocaine.  So they made a specific

22    finding that he did not do that.

23          The government also asked for a specific jury form

24    that said did the drugs that he sold to Mr. Tonks result in his

25    death?  Even though the government presented expert testimony

1     that that expert thought that the fentanyl caused his death,

2     the jury seemingly rejected that opinion testimony and

3     acquitted him of that conduct as well.

4          So really Your Honor isn't operating in a vacuum of

5     what was the jury thinking or not thinking.  Your Honor has

6     information from the jury.  I'm not suggesting that this court

7     can never consider acquitted conduct or can never consider

8     uncharged conduct.  Clearly the law indicates that Your Honor

9     can consider both of those.  But in this particular case, with

10    these particular findings, I would submit to the court the

11    court should not -- should find that in this case doing those

12    things do press and go beyond constitutional limits on

13    sentencing.

14         In this particular case, Your Honor, the burden of

15    proof from the case law is preponderance of the evidence.  A

16    preponderance of the evidence standard that raises the stakes

17    so high has not been found in a case where there's been a jury

18    verdict.  The cases cited by the government where there's been

19    such extreme increases in sentencing factors have all been

20    pleas.  There are cases where individuals plead guilty to drugs

21    and then there's a fight at sentencing about whether or not the

22    drugs that were sold resulted in death or not.  That is not

23    this case.  We have a jury verdict form.  We have sentencing

24    guidelines that specifically don't make those findings.

25         Even in the cases where the court finds an increase in

1    the Sentencing Guidelines are warranted based on uncharged or

2    acquitted conduct, the Probation Department in creating the PSR

3    took that into account.  So in those cases, the PSR has

4    properly calculated an elevated rate.  In this case probation

5    did not increase any amount, and we submit properly didn't

6    increase any amount because it's not warranted.

7          The last point is burden of proof:  Has the government

8    demonstrated by a preponderance of the evidence that the

9    defendant should be held responsible for Mr. Tonks's death?

10   And we would submit to the court that they haven't.  First and

11   foremost, they actually need to prove two things:  First, that

12   Mr. Tonks sold him cocaine.  They haven't proved that by a

13   preponderance of the evidence.

14         I know it's mentioned in my memo, and I won't belabor

15   the point too much, but I will point out to the court that Mr.

16   Tonks constantly referred to the only drug he was buying from

17   the defendant as "white."  We know that when "white" is

18   referenced to Mr. Carvajal that "white" refers to fentanyl.  We

19   know that because, first and foremost, Mr. Tonks bought white

20   in January, went to a hospital and had fentanyl in his system.

21   We know it secondly because there was no message, no text where

22   Mr. Tonks ever indicated that he wanted a different or unknown

23   drug.  We know because the agent who bought drugs from

24   Mr. Carvajal only asked for white and expected to receive

25   fentanyl.  We know that both from the testimony of the agent

1   who supervised the investigation and from the agent who engaged

2   in negotiations with Mr. Carvajal.  So at every turn "white"

3   for Mr. Carvajal seems to indicate fentanyl.  I'm sorry, one

4   more.  Lastly, when the agent filed his affidavit in front of

5   this court asking for Mr. Carvajal's arrest, he indicated that

6   "white" meant fentanyl.

7        So the government's first hurdle that "white" is

8   somehow in this case cocaine is not supported under a

9   preponderance of the evidence standard in any way.  There is no

10  evidence that Mr. Carvajal ever at any point sold cocaine to

11  Mr. Tonks.

12       The second part is what is it that caused Mr. Tonks's

13  death?  Our expert testified to this court that she would have

14  determined the death to be inconclusive without an autopsy but

15  an autopsy was necessary to determine whether there was some

16  other ailment that killed Mr. Tonks or whether it was drugs.

17  The medical examiner, who did not conduct an autopsy, indicated

18  it was some sort of combination that did that.  But, again,

19  without any more specific information and without a finding

20  that he sold cocaine to Mr. Tonks, we would submit it does not

21  meet the preponderance of the evidence standard.

22       We submitted to the court I think yesterday an article

23  from the Globe indicating that this exact same medical

24  examiner's office took a situation where it seemed quite

25  obvious what caused a trooper's death and reversed its decision

1    because they conducted a deeper autopsy.  The court saw the

2    article.  There was a trooper who was struck by a car by

3    another individual.  He was hospitalized and eventually died.

4    The medical examiners initially said the car accident, him

5    being hit by the civilian, is what caused his death.  Upon

6    conducting a thorough autopsy reversed their decision and found

7    that he died of natural causes unrelated to that.  This is why

8    me need autopsies.  This is why our expert testified to such.

9    And this is why the court should find the government hasn't met

10   its burden by a preponderance of the evidence standard.

11          The last thing I'll mention to the court is my sort of

12   generalized concern.  Certainly the Tonks family is here, has

13   been through the trial and testified.  I'm sure -- I know it's

14   very heart-wrenching for them.  It's very hard for all of us to

15   hear.  And their sadness and their willingness to talk is I

16   hope helpful for them and helps them assisting in getting some

17   sort of closure in what I can only imagine is an incredibly

18   difficult situation for them.

19          That need for closure and that desire to hear from

20   them does not mean the court should then deviate from what Your

21   Honor has been doing for, gosh, a lifetime, which is presiding

22   over trials, letting juries decide what people are guilty of

23   and then having Your Honor impose that sentence based on what

24   someone is found guilty of.  The government is not asking this.

25   They're not saying punish him for selling drugs.  They're

1    saying punish him for killing Mr. Tonks, something he was not

2    convicted of.

3         I would submit to the court that doing that, exceeding

4    the guideline recommendation that the government is requesting,

5    does a dishonor to the justice system that Your Honor presides

6    over every day and does a dishonor to juries.

7         As I mentioned in my sentencing memo, there's a quote

8    from a juror in one of the prior cases -- not one of our cases,

9    an Appeals Court case, where they wrote to the court indicating

10   their disheartenment to see that the judge in that particular

11   case exceeded greatly a punishment, or exceeded a sentence for

12   offenses that they were acquitted of.

13        The cites that I mentioned in my case law either from

14   dissents of current Supreme Court justices -- from Supreme

15   Court justices themselves have all indicated that there are

16   limits to accepting acquitted conduct, that there are

17   constitutional limits to exceeding Sentencing Guidelines.  I

18   fear that if the court adopts this recommendation by the

19   government, the message the court is sending is that

20   prosecutors should charge as many different offenses as

21   possible or charge the lowest possible offenses possible in

22   order to get an easy conviction and then ratchet up sentences.

23   If we keep saying, well, I'm sure the government won't do that

24   in such a case, they do and they will, as they've shown here.

25        This is the only case I could find -- and I apologize

1   if there isn't one I couldn't locate -- where the government

2   charged somebody with just distributing drugs that resulted in

3   a death, was unsuccessful at that, and then still insisted that

4   the defendant be punished for that offense.  I haven't seen it.

5   This isn't the case with a factual scenario that the court

6   should adopt to use it.

7          And I'll talk just very briefly about Mr. Carvajal.

8   The reason I say that is because Mr. Carvajal is not a big drug

9   dealer.  He didn't make millions off of selling drugs.  He

10  isn't the type of kingpin calloused uncaring drug dealer.  Your

11  Honor certainly has imposed sentences on those types of people,

12  individuals who are mid level or high level drug dealers who

13  are making significant profits and taking no risk.  That is not

14  Mr. Carvajal.

15         As the court concedes from the sentencing memo, as the

16  court concedes from the PSR, Mr. Carvajal is a recent immigrant

17  to the United States and was working hard.  He obtained one job

18  after another in an attempt to support himself and his family

19  and made a poor decision to sell drugs as a way to supplement

20  that income.

21         The court can note that the largest amount he ever

22  sold was the amount the agent got him to sell because we have

23  his cell phone.  He didn't delete calls or erase calls.  We see

24  the breadth of his drug dealing distribution and it's small.

25  He's not a rung on the ladder.  He is the first rung.  He is

1    the bottom rung on the ladder.  And for the court -- and the

2    for the government, excuse me, to ask for such a severe

3    punishment for someone who is so low on the ladder I would

4    submit to the court is not an appropriate use of that.

5           The Sentencing Guidelines range that's created for

6    Mr. Carvajal right now, the 51-month sentence, that is

7    sufficient and it is more than necessary to assure he won't

8    reoffend.  If Mr. Carvajal will continue being detained, he

9    will be deported from the United States.  He is not likely to

10   return to the United States in any lawful way because he's not

11   able to.

12          I would submit that Mr. Carvajal is not the type of

13   person who would repeat a reentry into the United States or

14   repeat his offense.  He had no prior criminal history before

15   this offense.  The vast majority of his family is in the

16   Dominican Republic.  That's where he was sending money to.

17          We would ask the court to realize that beyond whatever

18   sentence Your Honor imposes, there is going to be a period that

19   he will residing in immigration custody before he's removed

20   from the United States.  The court can see from my sentencing

21   memo that I was asking for a minor departure down from that to

22   accomplish those six months.  But certainly if the court

23   imposed 51 months or anything close to that sentence, that

24   would certainly be sufficient to accomplish that goal.

25          I know that Mr. Carvajal also wants to address the

1    court briefly.  So unless the court has any other questions or

2    concerns.

3         THE COURT:  I'll give the government a chance to

4    respond if they want as well.  But before I do that, I guess

5    I'm just not getting the significance of your trying to

6    distinguish between whether cocaine was present or not.

7         MR. MASFERRER:  The medical examiner indicated that

8    cocaine and fentanyl were the cause --

9         THE COURT:  That was her opinion.  Right?

10        MR. MASFERRER:  Yes, it was.

11        THE COURT:  It's not necessarily controlling.  But the

12   government, in its previous statement, argued, and I think in

13   its papers, that whether it was a combination of fentanyl and

14   cocaine or just fentanyl, taking the verdict literally, there's

15   no difference in the outcome that the government seeks.  I

16   guess I don't see what you think is the difference.

17        MR. MASFERRER:  I think the difference, Judge, is

18   that, one, the government has to prove by a preponderance of

19   the evidence what caused Mr. Tonks's death, and they haven't

20   met that burden predominantly because one expert, the medical

21   examiner who's qualified to state it, said it was a

22   combination.  So if Mr. Carvajal never sold cocaine to

23   Mr. Tonks, then that's not the combination that causes his

24   death.

25        The evidence at trial was the cocaine in his system

1    was substantially more than the fentanyl in his system.  So the

2    cocaine alone could have caused Mr. Tonks's death.  If my

3    client didn't sell him that cocaine, then he shouldn't be held

4    responsible for it.

5          THE COURT:  Is this kind of a *Burrage* argument?  Is

6    that what you're trying to make?

7          MR. MASFERRER:  I'm sorry, Your Honor?

8          THE COURT:  *U.S. v. Burrage*, the Supreme Court case

9    that says it has to be the but-for cause?

10          MR. MASFERRER:  I have cited that in my memo.

11          THE COURT:  That's a guilt, not a sentencing.

12          MR. MASFERRER:  That is there, but that's not what I

13    was arguing to the court right now.

14          I'm just saying under the preponderance of the

15    evidence standard, there has to be a determination of which --

16    what narcotic caused his death if the fentanyl alone does not

17    cause his death.  So in other words, if he could have just

18    taken fentanyl and lived, as he had on every other occasion,

19    then my client selling him fentanyl isn't a but-for or even a

20    contributory cause of his death.

21          THE COURT:  Well, if his death resulted from whatever

22    it was that was supplied to him by the defendant, what

23    difference does it make parsing out exactly what it was, as

24    long as the two choices are controlled substances?

25          MR. MASFERRER:  But he didn't -- if he had sold both,

1    then yes, I would agree with the court, but he didn't sell

2    both.  He only sold one.  If that one doesn't cause his death

3    or that one in combination with the other doesn't cause his

4    death, this is the problem.

5           If Mr. Tonks died from a cocaine overdose and just the

6    cocaine alone killed Mr. Tonks, then how could the defendant

7    possibly be held responsible?  The medical examiner didn't say

8    if he had only taken cocaine, it would have killed him or if he

9    only taken fentanyl, it would have killed him.  The medical

10   examiner said:  I don't know.  I think it's a combination of

11   both.  I can't parse it out.

12          THE COURT:  Okay.

13          MR. MASFERRER:  That alone -- I've argued in my

14   sentencing memo the court should adopt the but-for

15   determination.  But even if the court doesn't want to go that

16   far, under a preponderance of the evidence if one drug killed

17   him alone and the government hasn't excluded that or proven it

18   was only fentanyl or only the fentanyl that killed him, then I

19   think that's the issue that the court has, or at least that's

20   my issue that I would submit that the court should not increase

21   Mr. Carvajal's punishment for.

22          THE COURT:  Okay.

23          MR. MASFERRER:  Thank you, Your Honor.

24          THE COURT:  Does the government want to make a

25   response?

1          MR. HASSINK:  Just briefly, Your Honor.  With respect
2     to the two drugs, yes, we are arguing that this court can make
3     a finding by a preponderance of the evidence that Mr. Carvajal
4     sold cocaine and sold fentanyl.  And the last drug deal this
5     court saw evidence that Mr. Tonks asked for 3.5, an eight ball
6     of cocaine.  That's what the testimony was -- that's what 3.5
7     is.  And can you do me one brown, which the testimony was that
8     was heroin or fentanyl, two drugs.  Those were the two drugs
9     that were found in his room.

10         However, if this court does not make such a finding
11    that Mr. Carvajal sold cocaine, we do argue that this court
12    should find by a preponderance of the evidence that it was the
13    fentanyl alone.  And what the medical examiner said was either
14    or can be lethal on their own.  Fentanyl, again, is a drug of
15    abuse.  It can cause death on its own.

16         So I don't think that -- and then you heard the
17    testimony of Dr. Bird about fentanyl being the cause of the
18    death.  So I don't think Dr. Bird and the medical examiner's
19    testimony was conflicting in any way on that point.  This court
20    can certainly find that the drugs the defendant dealt caused
21    the victim's death and should so find and use that as a basis
22    for an upward departure.

23         I think, just to respond, and again very briefly, to
24    the crux of the argument.  Mr. Masferrer is arguing that the
25    court by holding the defendant accountable for the death of

1    Mr. Tonks is somehow usurping the power of the jury.  What

2    Mr. Masferrer is actually trying to do is usurp the power of

3    the court in sentencing.

4         The jury found under a completely different standard

5    of proof that the drugs sold by the defendant did not cause his

6    death and we are not nor can we attack that verdict.  If they

7    had so found, he would have been subject to a 20-year mandatory

8    minimum.  We are not asking for that here.  We are asking this

9    court to do what courts have done, and it's been endorsed by

10   the Supreme Court, which is to take the offenses of conviction,

11   start there with the guideline range and then take a broad

12   range of conduct under 3553(a) into account for this particular

13   defendant when imposing a sentence.

14        The state of the law right now is that acquitted

15   conduct is perfectly permissible to be taken into account by

16   courts.  And in this case the court should do it.  This court

17   sat through the trial, we believe heard more than enough to

18   prove by a preponderance of the evidence that the defendant

19   caused Richard Tonks's death and because of that, it is a

20   perfectly appropriate consideration to be taken into account

21   when imposing an upward departure and an upward variance.

22        THE COURT:  Okay.  Before I hear from the defendant,

23   let me just -- I think the term "acquitted conduct" can be

24   misleading, because it refers -- the principle is that

25   acquitted conduct, if proved by a preponderance of the

1    evidence, may form a basis for a sentencing enhancement.  It

2    seems to me there are two possible understandings of acquitted

3    conduct.  One is where the jury has, in fact -- although we

4    would never know how this is divided -- in fact, was completely

5    unconvinced, even by a preponderance of the evidence.  And

6    that's the purest form of acquittal, I suppose.  But acquittal

7    also occurs when the jury thinks it's probably true but they

8    are not so satisfied that it's beyond a reasonable doubt.  I

9    think it's misleading to refer to that as acquitted conduct.

10   The term I would prefer, and in some cases I've used it, is

11   "unconvicted conduct" because it leaves open the question of

12   whether the jury actually had exonerated the defendant in their

13   judgment or simply had followed the burden of proof and said,

14   well, he may well have done it but we can't be convinced beyond

15   a reasonable doubt.  That's not actually acquitted -- an

16   acquitted attitude by the jury.  So I think the term is

17   misleading and unhelpful.

18         The question is whether there was evidence for

19   sentencing purposes of the substances and I'll just say that I

20   found the defense expert not very helpful, and the expert

21   testimony that convinced me most was Dr. Bird's.  I thought it

22   was the most reliable because he was more exhaustive in his

23   analysis.  The medical examiner was helpful but cautious in not

24   going beyond what her evidence indicated to her.  So I don't

25   think there's a problem with the way the jury has -- the way

1    the jury answered the question and what significance that has

2    for assessing the sentence in the case.

3           Okay, I think with respect to that, then if the

4    defendant wants to allocute, I'll hear from him.

5           Go ahead, sir.

6           THE DEFENDANT:  Greetings to everyone present in this

7    courtroom.

8           I want to say that I recognize I did something wrong.

9    I did something wrong for trying to get ahead and guaranteeing

10   my family a better future.  Out of necessity I made a bad

11   decision, needs like watching over my family, and a bad

12   decision for seeking financial support where I shouldn't have.

13   But I want to say that I've always worked hard and honestly to

14   make progress both in my country since I was very young until I

15   made the decision of leaving my country --

16          THE INTERPRETER:  The interpreter needs to clarify

17   something.

18          THE DEFENDANT:  When I went to live with my mother at

19   Turks & Caicos also the whole time I was there I worked hard

20   and honestly until seeking a better future.  I made the

21   decision to come to the United States.  Being here I started

22   studying and at the same time I was working.  I do not seek to

23   justify my actions, because selling drugs is not right.  But as

24   human beings imperfect, we make mistakes.

25          And that's why I don't feel well when I think of the

1   things that I did or used to do.  Because my actions not only

2   hurt my family, but they also ashamed my mother.

3          THE INTERPRETER:  The interpreter should correct that.

4          THE DEFENDANT:  Shamed my mother.  That's why all the

5   time I've spent in prison has helped me think about my life and

6   about this situation that I am living currently.  And even this

7   negative experience has marked my life in a positive way.

8   Because I've had a lot of time to think, to see and to realize

9   the things that I was doing and that they were wrong.  Also, to

10  value the little bit I have.  And also to realize all the time

11  that I have lost by being far away from my children and my

12  family.

13          Being in prison I've also had to suffer a lot, due to

14  not being able to be with my family during these past times,

15  during COVID and the financial situation happening in my

16  country.  Even being in prison I tried to continue studying and

17  voluntarily I also worked in prison.  It goes from painting to

18  bringing food to the inmates in my unit.

19          I want to say clearly in this courtroom that I do not

20  support the sale of illegal things or of drugs.  And I

21  recognize that I did it.  And it's because of that reason and

22  because of this experience in my life that I can say that it is

23  wrong.  It weakens me, I feel badly when I realize the things I

24  did or used to do.  And because of my bad decision I've spent

25  all these years in prison where I've had to live with real

1    criminals of all kinds, of all classes.

2            It's clear to me when I think about it.  I eventually

3    feel horrible because I must recognize that my mother taught me

4    better values, and I feel worse upon seeing that I have failed

5    her.

6            Well, with Your Honor's permission I would like to

7    offer condolences to the family because he was also a friend to

8    me.

9            I want to thank my attorneys and the justice system

10   and Your Honor because thanks to you and this experience in my

11   life, I can assure you that I will be a better person, a better

12   human being to be able to give to my son, if the Lord allows me

13   to, a better education.

14           That's all I wanted to say.

15           THE COURT:  Okay.

16           The principal, although general, guidance that the

17   statutes give us is expressed in Section 3553 of Title 18.  It

18   sets forth considerations to be taken account of in deciding an

19   appropriate sentence in any given case.  The circumstances of

20   the case, the particular facts of the events, the people

21   involved and so on vary from case to case, but the categorical

22   inquiry is similar.  Not all of the factors apply in every case

23   and usually there are some factors that are proper for

24   consideration that are the principal considerations in any

25   given sentence and there are some that don't necessarily apply

1    to the circumstances at hand.

2         The general instruction from the sentencing statute is

3    that the sentence should be appropriate, to consider the nature

4    and circumstances of the offense, to reflect the seriousness of

5    the offense, and to promote respect for the law.  Those are

6    important considerations in this case, as in any drug

7    distribution case.

8         In this category of cases, another very important

9    consideration expressed in the statute is to provide adequate

10   deterrence to criminal conduct.  And that applies both to

11   deterring an individual defendant who's being sentenced from

12   committing further crimes, but it also includes more widely an

13   important instruction, advice, to those other people who would

14   commit crimes or be tempted, to realize what the cost to them

15   may be if they're arrested and convicted.  In drug cases that

16   tends to be a very prominent consideration.

17        The nature and circumstances of these offenses is

18   recognized, sadly, as almost uncontrollable.  We have very

19   strict drug laws.  We impose strict sentences.  And yet we have

20   people who volunteer for the risk, and Mr. Carvajal I think was

21   one of those.  So while it's important to punish Mr. Carvajal

22   for what he has done, it's also very important to emphasize to

23   the broader public the tragedy that is being played out

24   particularly among young people, particularly among people in

25   the lower socioeconomic classes who are bearing the -- and not

1   just the victims like Mr. Tonks, sometimes it's even the

2   perpetrators who get dragged into it and end up spending time

3   in jail, but it's also, as we've heard, family members and

4   others who suffer the consequences.

5          A sentence within the guidelines range is insufficient

6   in this case.  The policy statement in the guidelines at 5K2.1

7   instructs that if death resulted, the court may increase the

8   sentence above the authorized guideline range.  That is

9   entirely appropriate under these circumstances.  There was

10  nothing -- I will say this: It was not an intentional homicide,

11  but it was intentional distribution of homicidal drugs.

12         I think a sentence above the guideline range at the

13  lower end of the range that the government has recommended is

14  appropriate, that is, ten years on each count concurrent.

15         So Mr. Carvajal, if you'd stand, please.

16         Bernardito Carvajal, on your conviction of these

17  offenses and pursuant to the Sentencing Reform Act of 1984, it

18  is the judgment of the court that you be and you are hereby

19  committed to the custody of the Bureau of Prisons to be

20  imprisoned for a term of 120 months.  This consists of equal

21  terms on both of the counts of conviction to be served

22  concurrently.

23         Upon your release from imprisonment, you shall be

24  placed on supervised release for a term of three years.  This

25  consists of equal terms of three years on each count to be

1    served concurrently.  Within 72 hours of your release from the

2    custody of the Bureau of Prisons, you shall report in person to

3    the district to which you have been released.  While you're on

4    supervised release, you shall comply with all the standard

5    conditions that pertain to that status.  Those are set forth in

6    the United States Sentencing Guidelines and shall be set forth

7    at length in your judgment.

8            In addition to those conditions, you shall comply with

9    the following conditions: You must not commit any other

10   federal, state or local crime.  You may not unlawfully possess

11   any controlled substance.  You are to refrain from the unlawful

12   use of any controlled substance and are to submit to a drug

13   test within 15 days of your release from imprisonment and at

14   least two periodic drug tests thereafter, not to exceed 104

15   tests per year.  You are to cooperate in the collection of a

16   DNA sample at the direction of the Probation Office.

17           If deported, you are to leave the United States and

18   not return without the prior permission of the Secretary of the

19   Department of Homeland Security.  You must use your true name

20   and are prohibited from the use of any false identifying

21   information, including but not limited to aliases, false dates

22   of birth, false Social Security numbers or incorrect places of

23   birth.  Because it does not appear that the defendant has the

24   ability to pay a fine, I will not impose a monetary fine as

25   recommended by the guidelines.  But there is a $100 assessment

1   for each of the two counts of conviction to be due forthwith.

2          THE CLERK:  Mr. Carvajal, you have the right to file a

3   notice of appeal in this case.  And if you do wish to file an

4   appeal, you must file it within 14 days --

5          THE INTERPRETER:  May I have the number of days again?

6          THE CLERK:  14.

7          -- 14 days from the date the judgment is entered.  Do

8   you understand, sir?

9          THE DEFENDANT:  Yes.

10         THE COURT:  The defendant is committed to the custody

11  of the marshal.  We'll be in recess.

12         MR. HASSINK:  Your Honor.  I'm sorry, Your Honor.

13  Disregard.

14         THE COURT:  Okay.

15         THE CLERK:  All rise for the court.  Court will be in

16  recess.

17  (Proceedings adjourned at 4:33 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken March 16, 2022 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    9/9/22

16

17   Kathleen Mullen Silva, RPR, CRR               Date
     Official Court Reporter
18

19

20

21

22

23

24

25